850 F.2d 133
 46 Empl. Prac. Dec. P 38,064, 57 USLW 2014,
3 Indiv.Empl.Rts.Cas. 699
 POLICEMEN'S BENEVOLENT ASSOCIATION OF NEW JERSEY, LOCAL 318
and Edmund Giordano, Individually, and as
President of the Policeman's Benevolent
Association of New Jersey, Local 318
v.
TOWNSHIP OF WASHINGTON (GLOUCESTER COUNTY), a Municipal
Corporation Under the Laws of New Jersey, John Robertson,
Mayor, Leonard Simmons, Daniel Mangini, Margaret Smith,
Richard Marsella, and Virginia Weber, Council Members.
Appeal of TOWNSHIP OF WASHINGTON and John Robertson, Mayor.
 No. 87-5793.
 United States Court of Appeals,
Third Circuit.
 Argued May 3, 1988.
Decided June 21, 1988.
Rehearing and Rehearing In Banc Denied July 28, 1988.
 
 Joseph A. Alacqua (argued), Turnersville, N.J., for appellants.
 Ralph Henry Colflesh, Jr. (argued), Colflesh & Burris, Moorestown, N.J., for appellees.
 James Katz, Tomar, Seliger, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for amicus curiae, American Civil Liberties Union of New Jersey.
 Before GIBBONS, Chief Judge, and MANSMANN and COWEN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 The Township of Washington, New Jersey, appeals from a summary judgment in favor of the plaintiffs, Policemen's Benevolent Association of New Jersey, Local 318, and Edmund Giordano, a police officer, in a suit challenging on Fourth Amendment grounds the Township's drug testing program for police officers. The district court held that a drug testing program involving any selection method other than individualized reasonable suspicion violated the Fourth Amendment, and enjoined enforcement of the Township's random testing and annual medical examination programs for police officers. 672 F.Supp. 779. We will reverse.
 
 I.
 
 2
 The drug testing policy which the Township police officers challenge is embodied in a document entitled Drug Testing Program of the Township of Washington, adopted in November, 1986 and revised February 25, 1987. The police officers' lawsuit was filed, however, on September 8, 1986, in response to a memorandum from the Mayor of the Township to all department heads and municipal employees announcing that the Township would begin a mandatory drug testing program. That announcement, dated August 5, 1986, was apparently made in response to the call on August 4, 1986 by President Ronald Reagan for every level of government to take steps to assure a drug free work place. The August 5, 1986 announcement contained no details of the proposed plan. Nevertheless the complaint alleged that "no guidelines for the protection of police employee's privacy were announced nor was there announced a method of assuring that said test would accurately reflect the presence of controlled dangerous substances in an employee's system." Complaint, Count I, p 4. The proposed program was alleged to violate the First, Fourth, Fifth, Ninth and Fourteenth Amendments of the United States Constitution, and Article I, paragraphs 1, 2 and 7 of the New Jersey Constitution. Injunctive relief and damages were requested solely on behalf of Township police officers.
 
 
 3
 The plaintiffs sought pendente lite relief, but since the complaint was obviously premature an ex parte temporary restraining order was dissolved and a preliminary injunction was denied. Thereafter the Township formulated and revised the drug testing program. The plaintiffs then stipulated that they now challenge the revised plan as unconstitutional in only three respects:A. Those aspects which require random mandatory testing of employees represented by Plaintiff [police officers];
 
 
 4
 B. Those aspects which would require testing as part of any pre-textual physical examination, i.e., any physical examination which is not a bona fide medical examination given in the ordinary course of business and as a matter of the Township's policy for its police officers;
 
 
 5
 C. Those aspects which would require testing of all employees in mass form as within the dispositive facts of Capua v. City of Plainfield [643 F.Supp. 1507 (D.N.J.1986) ].
 
 
 6
 Stipulation dated May 18, 1987. Thus the plaintiffs withdrew any challenge to the plan on the basis of lack of assurance of privacy, or lack of assurance of accuracy.[1]
 
 
 7
 The plan calls for both testing on reasonable suspicion and random testing. The effect of the stipulation is to withdraw any challenge to the requirement of drug testing based on reasonable suspicion. The plan also requires all employees to undergo an annual medical examination, which includes urinalysis. The effect of the stipulation is to challenge the annual medical examination requirement for police officers only to the extent that it is a pretext for obtaining body fluids for drug testing. The reference in the stipulation to Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986), is to the holding in that case that a universal mass urinalysis of fire department employees of the City of Plainfield was unconstitutional.[2] The stipulation also excludes any challenge to the plan as applied to applicants for jobs as policemen. Thus the area of dispute was by stipulation narrowed to two questions: (1) whether a police department may require that police officers submit to random selection for urinalysis which will detect drug use; and (2) whether a police department may require that all police officers submit to an annual urinalysis which will detect drug use.
 
 
 8
 The parties filed cross-motions for summary judgment. The district court, relying solely on the Fourth Amendment, answered both questions negatively and granted the plaintiffs a summary judgment, enjoining Washington Township "from requiring police officers to submit samples of their urine to be tested for the presence of illegal drugs, except when there exists an individualized, reasonable suspicion based on objective facts and reasonable inferences drawn therefrom, that a particular police officer has engaged in the use of illegal drugs."
 
 II.
 
 9
 This court addressed the problem of state-imposed compulsory drug testing as a condition of certain types of employment in Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). That case upheld, against a Fourth Amendment search and seizure challenge, requirement that jockeys employed in the New Jersey horse racing industry submit to universal daily breathalyzer and random urinalysis testing. Recognizing that both the universal breathalyzer test and random urinalysis involved seizures within the meaning of the Fourth Amendment, we held that in a highly regulated industry such as horse racing the administrative search exception to the Fourth Amendment warrant requirement applied. That exception applied because the state had a strong interest in conducting an unannounced search, and because pervasive regulation in the industry reduced justifiable expectations of privacy. 795 F.2d at 1142. Because the Racing Commission's discretion was sufficiently circumscribed by the universal breathalyzer and random selection urinalysis requirements, we rejected the contention that the searches in question involved the exercise of standardless discretion. Id. at 1143.
 
 
 10
 The Washington Township Plan, as interpreted by the district court, involves both types of selection dealt with in Shoemaker. The plan's provision for random selection for urinalysis contains essentially the same procedural and privacy protections which we upheld in Shoemaker. The universal annual urinalysis for all police officers is the equivalent of the universal daily breathalyzer test for jockeys. Thus Shoemaker controls on the two issues presented in this appeal, unless we hold that the Washington Township Police Department is not a highly regulated industry to which the administrative search exception applies. The dispositive questions are (1) whether the state has a strong interest in determining whether police officers are using illegal substances, and (2) whether the pervasive regulation of the police industry reduced the justifiable privacy expectations of those officers.
 
 
 11
 The district court opined, and we agree, that "[t]he need to ensure that the Township's police are drug-free is an important one. Important public safety concerns are associated with a police officer's duties." Despite the recognition of this strong public interest, however, the district court concluded that police officers had expectations of privacy which mandated that urinalysis be required only upon individualized reasonable suspicion of illegal drug use. Our review of this legal conclusion is plenary.
 
 
 12
 Washington Township maintains a police department pursuant to authority delegated to it by N.J.Stat.Ann. Sec. 40A:14-118 (West Supp.1987), which provides:
 
 
 13
 The governing body of any municipality, by ordinance, may create and establish, as an executive and enforcement function of municipal government, a police force, whether as a department or as a division, bureau or other agency thereof, and provide for the maintenance, regulation and control thereof. Any such advance ordinance shall, in a manner consistent with the form of government adopted by the municipality and with general law, provide for a line of authority relating to the police function and for the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members. The ordinance may provide for the appointment of a chief of police and such members, officers and personnel as shall be deemed necessary, the determination of their terms of office, the fixing of their compensation and the prescription of their powers, functions and duties, all as the governing body shall deem necessary for the effective government of the force. Any such ordinance, or rules and regulations, shall provide that the chief of police, if such position is established, shall be the head of the police force and that he shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof, and that he shall, pursuant to policies established by the appropriate authority:
 
 
 14
 a. Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel;
 
 
 15
 b. Have, exercise, and discharge the functions, powers and duties of the force;
 
 
 16
 c. Prescribe the duties and assignments of all subordinates and other personnel;
 
 
 17
 d. Delegate such of his authority as he may deem necessary for the efficient operation of the force to be exercised under his direction and supervision; and
 
 
 18
 e. Report at least monthly to the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month, and make such other reports as may be requested by such authority.
 
 
 19
 As used in this section, "appropriate authority" means the mayor, manager, or such other appropriate executive or administrative officer, such as a full-time director of public safety, or the governing body or any designated committee or member thereof, or any municipal board or commission established by ordinance for such purposes, as shall be provided by ordinance in a manner consistent with the degree of separation of executive and administrative powers from the legislative powers provided for in the charter or form of government either adopted by the municipality or under which the governing body operates.
 
 
 20
 Except as provided herein, the municipal governing body and individual members thereof shall act in all matters relating to the police function in the municipality as a body, or through the appropriate authority if other than the governing body.
 
 
 21
 Nothing herein contained shall prevent the appointment by the governing body of committees or commissions to conduct investigations of the operation of the police force, and the delegation to such committees or commissions of such powers of inquiry as the governing body deems necessary or to conduct such hearing or investigation authorized by law. Nothing herein contained shall prevent the appropriate authority, or any executive or administrative officer charged with the general administrative responsibilities within the municipality, from examining at any time the operations of the police force or the performance of any officer or member thereof. In addition, nothing herein contained shall infringe on or limit the power or duty of the appropriate authority to act to provide for the health, safety or welfare of the municipality in an emergency situation through special emergency directives.
 
 
 22
 In one form or another the power to adopt regulations for the organization and discipline of a police force has been conferred on New Jersey municipalities since at least 1884. See, e.g., Hermann v. Town of Guttenberg, 86 N.J.L. 681, 94 A. 308 (1914). See also N.J.Stat.Ann. Sec. 40:48-1 (West Supp.1987) (general and regulatory powers of municipalities).
 
 
 23
 The broad grant of regulatory authority to Washington Township in the matter of the government and discipline of its police force is subject to "general law," which includes an extensive body of state statutory law. Among other things the state regulates hours of service, N.J.Stat.Ann. Secs. 40A:14-108, 40A:14-132, minimum salaries, Secs. 40A:14-110, 40A:14-131, age, Sec. 40A:14-127, days of employment and days off, Sec. 40A:14-133, emergency service and compensation for such service, Sec. 40A:14-134, and suspension and removal, Secs. 40A:14-156, 40A:14-147--14-151. State law confers on full-time municipal police officers the full power of arrest for any crime committed in their presence in the territorial limits of New Jersey. Sec. 40A:14-152.1. Police officers exercising police powers outside the territorial limits of the municipality which employs them are granted the same statutory immunity from suit as they have within that community. Sec. 40A:14-152.2. State law mandates attendance at and regulates the content of training courses for municipal policemen. 52:17B-66--17B-77.3; N.J.Admin.Code tit. 13, Secs. 1-1.1--1-11.12. Under the common law New Jersey police officers are considered to be municipal officers as distinguished from other municipal employees, and thus, except as modified by legislation, subject to the "no work no pay rule," and the residency rule applicable to public officers. See Township of Springfield v. Pedersen, 73 N.J. 1, 5-6, 372 A.2d 286, 288 (1977); Trainor v. City of Newark, 145 N.J.Super. 466, 473-74, 368 A.2d 381, 385 (App.Div.1976), certif. denied, 74 N.J. 255, 377 A.2d 661 (1977).
 
 
 24
 Acting pursuant to the authority delegated by the legislature, the governing body of Washington Township has adopted detailed regulations for the government and discipline of its police force, of which we take judicial notice. Fed.R.Evid. 201(b), (f). Those in effect at the time the challenged plan was adopted were enacted pursuant to Washington Township Ordinance No. 39-1974 and Resolution No. 105-1974. The ordinance authorized the Township Committee "from time [to time] to make and establish, amend or repeal, by resolution or ordinance, such rules and regulations, not inconsistent with the laws of this state or the ordinances of the township, for the government and control of the members of the Police Department, as may be deemed expedient and proper to carry out the objects of this ordinance and with the view to making the Police Department and all the officers and members thereof efficient, vigilant, prompt and useful to the township." Ordinance No. 39-1974, Sec. 19-4. The powers and duties of police officers are specified in section 19-5. These include the power and duty
 
 
 25
 to keep order in all public places of this township; to prevent, restrain and suppress any riot, row, disturbance, disorderly assembly or breach of the peace ..., to restrain vagrants, mendicants and street bargainers; and to require any persons unnecessarily congregated upon the sidewalks or corners of the street to disperse, and if they refuse, to arrest them....
 
 
 26
 Section 19-5 also provides that members of the Police Department shall devote full time and attention to the service of the Department, and although hours are allotted for the performance of regular tours of duty, "officers are considered at all times available for duty and must act promptly at any time their services are required, except when on authorized leave or in the event of disability." The ordinance cross-references to Department Rules and Regulations, the current version of which was adopted by Resolution No. 105-1974. This 72 page manual in a forward states:
 
 
 27
 The success of a police department in the performance of its duties is largely measured by the degree of support and cooperation it receives from the people of the community which it serves. It is of paramount importance that we secure the confidence, respect, and approbation of the public. The cultivation of such desirable attitudes is dependent upon proper performance of duty by all the members of the department.
 
 
 28
 Chapters 1 and 2 of the regulations set forth the organizational structure of the Department, which in broad terms may be described as quasi-military. Chapter 3 sets forth General Rules and Regulations; Chapter 4, Personnel Regulations; and Chapter 5, Disciplinary Regulations. Among the General Rules and Regulations, those particularly relevant to the question whether police officers may have lowered expectations of privacy because they have chosen to enter a highly regulated industry include:
 
 
 29
 "3:1.1 Standard of Conduct. Members and employees shall conduct their private and professional lives in such a manner as to avoid bringing the department into disrepute.
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 "3:1.6 Duty Responsibilities. Members of the department are always subject to duty although periodically relieved of its routine performance. They shall, at all times, respond to the lawful orders of superior officers and other proper authorities as well as calls for police assistance from citizens. Proper police action must be taken whenever required. The administrative delegation of the enforcement of certain laws and ordinances to particular units of the department does not relieve members of other units from the responsibility of taking prompt, effective police action within the scope of those laws and ordinances when the occasion so requires. Members assigned to special duties are not relieved from taking proper action outside the scope of their specialized assignment when necessary.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 "3:1.26 Debts--Incurring and Payment
 
 
 36
 "(D) Members and employees shall pay all just debts and legal liabilities incurred by them.
 
 
 37
 "3:1.27 Intercession--Soliciting. Members and employees shall not solicit anyone to intercede with the Chief of Police, Mayor, or members of the Township Committee in relation to promotion assignments, disposition of pending charges, or findings in a department trial or other related matter.
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 "3:1.28 Persons and Places of Bad Reputation. Member [sic] and employees shall not frequent places of bad reputation, nor associate with persons of bad reputation, except as may be required in the course of police duty.
 
 
 41
 "3:1.19 Withholding Information. Members and employees shall not, at any time, withhold any information concerning criminal activity.
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 "3:1-30 Reporting Violations of Laws, Ordinances, Rules or Orders. Members and employees knowing of other members or employees violating laws, ordinances, or rules of the department, or disobeying orders, shall report same in writing to the Chief of Police through official channels. If the member or employee believes the information is of such gravity that it must be brought to the immediate personal attention of the Chief of Police, official channels may be bypassed.
 
 
 45
 "3:2.2 Alcoholic Beverages and Drugs.
 
 
 46
 "(A) No member or employee of the department will appear for or be on duty under the influence of liquor or drugs or be unfit for duty because of their excessive use.
 
 
 47
 "(B) Members or employees of the department shall not drink any kind of intoxicating beverage while on duty or take any drugs not duly prescribed and necessary for health at any time.
 
 
 48
 "(C) Employees of the department shall refrain from drinking intoxicating beverages for a period of at least four (4) hours before going on duty.
 
 
 49
 "(D) No member of the department shall, at any time when in uniform, except in the performance of duty, enter any place in which intoxicating liquor is served.
 
 
 50
 "(E) Intoxicating beverages may not be consumed at any police station.
 
 
 51
 "(F) Members and employees shall not bring into or keep any intoxicating liquor or drugs on department premises except when necessary in the performance of a police task. Liquor or drugs brought into department premises in the furtherance of a police task shall be properly identified and stored according to department policy.
 
 
 52
 * * *
 
 
 53
 * * *
 
 
 54
 "3:2.5 Physical Fitness For Duty. Members shall maintain good physical condition so that they can handle the strenuous physical contacts often required of a law enforcement officer.
 
 
 55
 "3:2.6 Loitering. Members on duty or in uniform shall not enter theatres or other public places except to perform a police task. Loitering and unnecessary conversation in such locations are forbidden. Members and employees off duty and not on any official standby shall not loiter in police department areas.
 
 
 56
 "3:2.7 Smoking While On Duty. Members shall not smoke on duty while in direct contact with the public nor when in uniform in public view, except that smoking is permitted in public view at mealtimes and while patrolling in police automobiles at which times it shall be as inconspicuous as possible.
 
 
 57
 * * *
 
 
 58
 * * *
 
 
 59
 "3:3.1 Regulation Uniforms Required. All members shall maintain regulation uniforms. Uniforms shall be kept neat, clean, and well-pressed at all times.
 
 
 60
 "3:3.2 Manner of Dress On Duty. Normally members will wear the duty uniform on a tour of duty; however, commanding officers may prescribe other clothing as required by the nature of the duty which a particular member is assigned. Employees will wear and maintain an employee uniform when so directed by the Chief of Police.
 
 
 61
 "3:3.3 Wearing or Carrying Badge or I.D. Card. A member, when in uniform, shall wear the regulation badge on the outside of the outermost garment over the left breast and always in sight. When not in uniform or off duty, he shall carry his badge or I.D. Card in his pocket.
 
 
 62
 "3:3.4 Wearing of Name Badge. A member, when in uniform, shall wear the regulation name badge on his uniform shirt or dress jacket, whichever is outermost, in accordance with department instructions.
 
 
 63
 * * *
 
 
 64
 * * *
 
 
 65
 "3:3.8 Carrying Equipment Off Duty. When off duty, each member will carry or have in his immediate possession, his badge, department revolver, or a pistol or revolver of not less than .32 caliber as authorized by the department, and the identification card. This rule shall not apply when members are engaged in sports and activities of such a nature as to make it impractical.
 
 
 66
 "3:3.9 Civilian Clothing--Manner of Dress. Male members and employees permitted to wear civilian clothing during a tour of duty shall wear either a business suit or sport coat and slacks. A dress-type shirt with tie shall be worn. Commanding officers may prescribe other types of clothing when necessary to meet a particular police objective. Female members and employees permitted to wear civilian clothing shall conform to standards normally worn by office personnel in private business firms, unless otherwise directed.
 
 
 67
 * * *
 
 
 68
 * * *
 
 
 69
 "3:3.12 Personal Appearance. Every member and employee of the department, while on duty, must at all times be neat and clean in person, his clothes clean and pressed, and his uniform in conformity with the rules and regulations. He shall, as often as necessary, examine and clean his equipment and keep it always in good serviceable condition. Male members and employees shall conform to the following additional standards of appearance:
 
 
 70
 "(A) Hair shall be evenly trimmed at all times while on duty. The hair shall at no point extend downward over the shirt collar in normal posture.
 
 
 71
 "(B) Sideburns shall not extend below the bottom of the ear. The maximum width at the bottom of the sideburns shall not exceed 1 3/4 inch.
 
 
 72
 "(C) A clean-shaven appearance is required except that mustaches are permitted. Mustaches shall be neatly trimmed and shall not extend more than 1/2 inch beyond the corners of the mouth nor more than 1/4 inch below the corners of the mouth. Remainder of the face shall be clean shaven.
 
 
 73
 "(D) Beards shall not be permitted.
 
 
 74
 "(E) Personnel with a medical condition which precludes shaving shall be required to present a written statement, signed by a medical doctor, verifying such condition.
 
 
 75
 * * *
 
 
 76
 * * *
 
 
 77
 "3:8.3 Use of Derogatory Terms. Members and employees shall:
 
 
 78
 "(A) Neither speak disparagingly of any race or minority group nor refer to them in insolent or insulting terms of speech, whether prisoners or otherwise.
 
 
 79
 "(B) Neither use uncomplimentary terms of speech when referring to any prisoner or other person nor willfully antagonize any person with whom he comes in contact.
 
 
 80
 * * *
 
 
 81
 * * *
 
 
 82
 "3:10.1 Conduct Toward the Public. Members and employees shall be courteous and orderly in their dealings with the public. They shall perform their duties quietly, avoiding harsh, violent, profane, or insolent language and shall always remain calm regardless of provocation. Upon request, they are required to supply their names and badge numbers in a courteous manner. They shall attend to requests from the public quickly and accurately, avoiding unnecessary referral to other parts of the department.
 
 
 83
 "3:10.2 Impartial Attitude. All members, even though charged with vigorous and unrelenting enforcement of the law, must remain completely impartial toward all persons coming to the attention of the department. Violations of the law are against the people of the state and not against the individual officer. All citizens are guaranteed equal protection under law. Exhibiting partiality for or against a person because of race, creed, or influence is conduct unbecoming an officer. Similarly, unwarranted interference in the private business of others when not in the interests of justice is conduct unbecoming an officer.
 
 
 84
 "3:10.3 Disparaging Nationality, Race, or Creed. Courtesy and civility toward the public is required of all members of the department. Members shall not use words which humiliate, disparage, demean, degrade, ridicule, or insult a person because of his race, creed, color, national origin, or ancestry.
 
 
 85
 * * *
 
 
 86
 * * *"3:10.8 Commercial Testimonials. Members and employees shall not permit their names or photographs to be used to endorse any product or service which is in any way connected with law enforcement without the permission of the Chief of Police. They shall not, without the permission of the Chief of Police, allow their names or photographs to be used in any commercial testimonial which alludes to their positions or employment with the department.
 
 
 87
 "3:10.9 Public Appearance Requests. All requests for public speeches, demonstrations, and the like, will be routed to the Chief of Police for approval and processing. Members and employees directly approached for this purpose shall suggest that the party submit his request to the Chief of Police.
 
 
 88
 Among the Personnel Regulations one, bearing particularly on the police officer's diminished lowered expectations of privacy, reads:
 
 
 89
 4:1.1 (G) He shall submit to and pass such physical examination as may be prescribed by the Chief of Police with the approval of the Township Committee.
 
 
 90
 (H) He shall submit to and pass such written, oral, psychiatric, physiological, or performance evaluation tests as are prescribed by the Chief of Police with the approval of the Township Committee.
 
 
 91
 These statutes and regulations speak for themselves. They establish that the police industry is probably the most highly regulated, with respect to performance of its employees, of any industry in New Jersey. When compared with the history of regulation held in Shoemaker to be sufficient for application of the administrative search exception, the occupation of police officer is far more intensely regulated. The Washington Township police officers are members of quasi-military organizations, called upon for duty at all times, armed at almost all times, and exercising the most awesome and dangerous power that a democratic state possesses with respect to its residents--the power to use lawful force to arrest and detain them. The need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers that awesome power is significantly greater than the state's need to instill confidence in the integrity of the horse racing industry. The plaintiffs' efforts to distinguish Shoemaker are unavailing. That case controls, and requires the reversal of the summary judgment in their favor. Plaintiffs' remaining arguments simply dispute the Shoemaker precedent. This panel is not free, however, to disregard it.[3]
 
 III.
 
 92
 The parties are in agreement that there are no material issues of disputed fact. On the present record the Township is entitled to a judgment in its favor on the plaintiffs' Fourth Amendment claim. The district court did not address the plaintiffs' contention that the plan also violated Article I, paragraphs 1, 2 and 7 of the New Jersey Constitution. We express no view on the question whether the New Jersey Constitutional provisions on which the plaintiffs rely would afford greater protection from random or universal mandatory urinalysis of police officers than does the Fourth Amendment.[4] The judgment appealed from will be reversed and the case remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The plan contains detailed safeguards for maintaining the privacy of the testing and test results, and for assuring accuracy of the test results
 
 
 [2]
 The Capua court held (1) that the Plainfield plan contained no procedural protection or confidentiality guarantees, and (2) that the fire department was not a highly regulated industry. 643 F.Supp. at 1519, 1521. In this case the Washington Township Plan is not challenged on the first Capua ground
 
 
 [3]
 Other courts have followed it. See, e.g., National Treasury Employees Union v. Von Raab, 816 F.2d 170, 179-80 (5th Cir.1987) (analogizing Customs Service to highly regulated industry), cert. granted, 108 S.Ct. 1072 (1988); McDonnell v. Hunter, 809 F.2d 1302, 1308 (8th Cir.1987) (correctional officers); Rushton v. Nebraska Pub. Power Dist., 653 F.Supp. 1510, 1524-25 (D.Neb.1987) (nuclear power plant employees). But see, e.g., Railway Labor Executive's Ass'n v. Burnley, 839 F.2d 575, 585 (9th Cir.1988) (distinguishing Shoemaker ); American Fed'n of Gov't Employees v. Weinberger, 651 F.Supp. 726, 734-35 (S.D.Ga.1986) (distinguishing and criticizing Shoemaker ); Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark, 216 N.J.Super. 461, 469, 524 A.2d 430, 434-35 (App.Div.1987) (distinguished Shoemaker, but did not reach federal constitutional issue); Caruso v. Ward, 133 Misc.2d 544, 506 N.Y.S.2d 789, 798 (N.Y.Sup.Ct.1986) (distinguishing Shoemaker ), aff'd, 131 A.D.2d 214, 520 N.Y.S.2d 551 (N.Y.App.Div.1987)
 
 
 [4]
 See Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark, 216 N.J.Super. 461, 477, 524 A.2d 430, 438-39 (App.Div.1987)