Beverly **WILCHER, Sharon Smith, Michael Danylo, Cornelius Skinner, Wilmington Firefighters Assoc. Local 1590, Plaintiffs,**

v.

**CITY OF WILMINGTON, James A. Sills, James T. Wilmore, Sr., Clifton E. Armstead, S.A. Wayne Crosse, William J. Yanonis, Defendants.**

**CITY OF WILMINGTON, Third Party Plaintiff,**

v.

**SODAT–DELAWARE, INC., Third Party Defendant.**

Civ. A. No. 94–137–JJF.

United States District Court, D. Delaware.

June 30, 1995.

---

Teresa C. Fariss, Jan R. Jurden, and Nancy E. Whinnery, of Young Conaway Stargatt & Taylor, Wilmington, DE, for plaintiffs.

Lynn S. Seth, Asst. City Sol., Wilmington, DE, for City of Wilmington defendants/third party plaintiffs.

Bruce C. Herron, of Sawyer & Akin, Wilmington, DE, for third party defendant SODAT–Delaware, Inc.

## MEMORANDUM OPINION

FARNAN, District Judge.

The Court held a three day bench trial in this matter commencing on September 29, 1994, and continuing through the early part of October 1994. At the close of the trial, the parties were given the opportunity to submit post-trial briefing which was completed in December 1994. The Court has considered and weighed the evidence adduced at trial and reviewed the post-trial submissions of the parties and the case is now ready for decision. This Memorandum Opinion shall constitute the Court's Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52.

## I. FINDINGS OF FACT

### A. Background

The Plaintiffs in this action are Beverly Wilcher, Sharon Smith, Michael Danylo, Cornelius Skinner, and the Wilmington Firefighters Association. The individual Plaintiffs are all firefighters employed by the Defendant City of Wilmington and are all members of Plaintiff Wilmington Firefighters Association Local 1590 ("Union"). The Defendants are the City of Wilmington ("City"), James A. Sills, the Mayor of the City, S.A. Wayne Crosse, City Personnel Director,

James T. Wilmore, Sr., Chief of the Fire Department, Clifton E. Armstead, Deputy Fire Chief, City of Wilmington, and William J. Yanonis, Deputy Personnel Director. Mayor Sills and Personnel Director Crosse have been sued in their individual capacities while Chief Wilmore, Deputy Chief Armstead, and Mr. Yanonis have been sued in their individual and official capacities.

The City, as a Third Party Plaintiff, has also sued SODAT Delaware, Inc. ("SODAT")[1] and SODAT has cross-claimed against the City, Mayor Sills, Chief Wilmore, Deputy Chief Armstead, Personnel Director Crosse, and Mr. Yanonis. This is a class action filed on behalf of all firefighters employed by the City of Wilmington who were subject to a random drug testing program between January and March of 1994. During the course of the trial, individual Defendants Sills, Wilmore, Armstead, Crosse and Yanonis moved for judgment as a matter of law in their individual capacities asserting the defense of qualified immunity. The Court granted Defendants' motion. SODAT also moved for judgment as a matter of law which the Court granted on Plaintiffs' § 1983 claims. In both instances, the Court announced the reasons for its decision from the Bench. Therefore, presently before the Court are Plaintiffs' federal law claims under § 1983 against the City and the Defendants in their official capacities and Plaintiffs' state law privacy claims against the City, the individual Defendants in their official capacities, and SODAT.

The City and the Union entered into collective bargaining negotiations in 1990 and at that time the City sought to include in the Collective Bargaining Agreement a provision, providing for the random drug testing of City firefighters. On July 1, 1990, the parties entered into a Collective Bargaining Agreement which included a provision for random drug testing of firefighters. Plaintiffs' Trial Exhibit No. 1, A–26. However, the Agreement was silent with regard to any specific procedure that was to be implemented for the collection of the firefighters' urine speci-

mens. Pursuant to the Agreement, all City firefighters were subjected to the requirement that they provide randomly obtained urine specimens between the years 1990 and 1993. These urine specimens were taken at the Occupational Health Department of the Wilmington Hospital in accordance with a procedure established by the Occupational Health Department. That procedure involved the random selection of a firefighter by the City Department of Fire. The firefighter randomly selected became aware of his or her selection when a battalion chief arrived at the firestation and advised the firefighter of his or her selection. The firefighter was then transported by the battalion chief to the Occupational Health Department of the hospital. Upon arrival at the hospital, the firefighter was directed to a bathroom facility, known as a "dry room," in which the water at the sink was turned off and the water in the toilet dyed blue to prevent any dilution of the urine specimen. Throughout the process, firefighters remained in their working uniforms and were not physically searched in any manner. Trial Transcript, A–3, A–6.

### B. *The Challenged Procedure Utilized by SODAT*

On or about November 1, 1993, the City sought proposals from persons and/or entities willing to provide a random drug and alcohol testing program for City employees as well as a pre-employment testing program. It was the City's view that by consolidating its alcohol and drug testing programs it might be able to obtain some cost savings benefits. Trial Transcript, A–4. In response to its Request for Proposals, the City received three proposals. One of those proposals was submitted by SODAT and contained the procedures that SODAT would follow in conducting the random and pre-employment testing sought by the City. Plaintiff's Trial Exhibit 12, A–40. In that proposal, SODAT advised that its random drug testing program involved direct super-

---

**1.** SODAT is a private, non-profit corporation which performs pre-employment and random urine drug screens through contracts with various entities. SODAT also provides drug and

alcohol out-patient counseling services, and other evaluation services to the State of Delaware for persons charged with substance abuse offenses.

vision of the individual submitting the sample. For reasons of cost and convenience of schedule, SODAT's proposal was accepted over the other two proposals. Trial Transcript, A–138. SODAT commenced its random drug testing program of City firefighters in January 1994.

SODAT's specimen collection procedure was similar to that employed by the Occupational Health Department of the hospital, except SODAT's procedure provided for direct supervision of the person being tested as opposed to a "dry room" procedure. SODAT's procedure required that the firefighter enter a private bathroom accompanied by a SODAT employee trained in urine collection procedures, and that the SODAT employee remain in the bathroom while the firefighter urinated into the specimen bottle. The SODAT employee who accompanied the firefighter into the bathroom was of the same sex as the firefighter.

Plaintiffs and Defendants have portrayed SODAT's specimen collection procedure quite differently. Thus, a review of the relevant testimony with regard to what actually occurred in the bathroom during the specimen collection procedure is necessary. This finding is important in relationship to the balancing test the Court must perform in reaching its legal conclusions with regard to the constitutionality of the subject collection procedure. Prior to commencing the review of this testimony, the Court in reaching its finding on this factual question notes that it has evaluated the demeanor and credibility of each witness, their relationship to the outcome of the litigation, and the availability of other testimony and exhibits that either credits or rebuts the witness' testimony.

### 1. Firefighter Danylo

Firefighter Danylo testified that he was surprised, extremely nervous, very embarrassed and displeased as a direct result of being directly observed as he produced his urine specimen. He felt that he was being treated like a criminal. Trial Transcript, A–215, A–217, A–219. Firefighter Danylo testified he was led into the bathroom and went to the urinal where he attempted to urinate into the specimen bottle. Accompanying Firefighter Danylo was a male SODAT employee who Firefighter Danylo testified was approximately six feet tall and weighed approximately two hundred pounds. Firefighter Danylo testified that the SODAT employee stood behind him and to his right, but close enough to Firefighter Danylo so that he could hear the employee breathing. From this position, Firefighter Danylo testified that the employee leaned over his right shoulder and observed Firefighter Danylo's genital area. Firefighter Danylo testified he was unable to produce a urine specimen after approximately five minutes of standing at the urinal. Firefighter Danylo requested a drink of water which he was given, and after a period of time he returned to the bathroom where he testified that he and the SODAT employee took up the same positions near the urinal. Firefighter Danylo testified he was still unable to produce a specimen, however, when the SODAT employee stepped back, Firefighter Danylo was able to produce a urine specimen. However, he was unable to testify as to where the SODAT employee was looking at the time he produced the specimen. Trial Transcript, A–8, A–215, A–216, A–217.

### 2. Firefighter Smith

Firefighter Smith testified that she was embarrassed about being required to urinate under observation and that she did not like the procedure. Firefighter Smith also testified that she was "disgusted at the system." Trial Transcript, B–116. Firefighter Smith testified that when she entered the bathroom she was accompanied by a female SODAT employee who positioned herself to the side of Smith at approximately an arms length distance. Smith produced the specimen. Thereafter, Firefighter Smith was again taken for a random drug test approximately one month later. On this occasion, Firefighter Smith testified she had great difficulty producing a urine specimen and during the course of her effort asked if the light could be turned off while she produced the specimen. Firefighter Smith testified that the SODAT employee accompanying her at this time did not answer her request and it took Firefighter Smith approximately twenty-five minutes before she was able to produce a specimen.

### 3. Firefighter Wilcher

Firefighter Wilcher testified that she was uncomfortable, very upset and embarrassed as a direct result of being subjected to the direct observation urine testing the first time it was imposed upon her. Firefighter Wilcher felt as though her integrity and character were being attacked and she had been stripped of her self-respect. Firefighter Wilcher testified that she was even more embarrassed the second time because of her menstruation. Firefighter Wilcher testified that as a result of the testing procedure she feels differently about her job and resents the way she believed she was made to feel like a criminal and a drug addict. Firefighter Wilcher testified she now lives in fear that she will be subjected to a direct observation procedure and that she will not use a restroom unless she can be alone while she urinates. Trial Transcript, B–135, B–137, B–155, B–156, B–158, B–160, B–162.

Firefighter Wilcher testified that the SODAT employee who accompanied her into the bathroom on her first random selection stood off to the side of her location. Firefighter Wilcher further testified that the employee did watch her as she commenced and finished urination. On Firefighter Wilcher's second visit, she had difficulty producing the specimen and it took her approximately twenty to twenty-five minutes during which time she testified that the SODAT employee was positioned similarly to the employee's positioning during the firefighter's first visit.

### 4. Firefighter Skinner

Firefighter Skinner testified that he was nervous, degraded, humiliated, very upset and very uncomfortable as a direct result of being observed as he produced his urine sample. Firefighter Skinner also testified that as a result of his experience at SODAT, he now uses a stall facility in public bathrooms, and if a stall facility is not available, he waits until there is no one standing at the urinals in the bathroom before he will urinate. Firefighter Skinner testified he is uncomfortable having anyone stand alongside of him while he is urinating. Firefighter Skinner also testified that his experience has caused him to be irritable and short tempered with his fiancee. Firefighter Skinner further testified that the experience he encountered as a result of the collection procedure has upset him to the point that he has sought counseling from the Employee Assistance Program. Trial Transcript, A–91–92, A–94–95, A–203, A–209.

Firefighter Skinner testified that when he entered the bathroom with the SODAT employee, he straddled the toilet and opened the plastic container in preparation to produce a urine sample. Firefighter Skinner testified that the SODAT employee positioned himself to Firefighter Skinner's right, however, when Firefighter Skinner attempted to turn away, he testified that the SODAT employee leaned over his shoulder and observed his genitals. Firefighter Skinner testified he attempted to shield his genital area from the SODAT employee, however, the SODAT employee positioned himself so that he was still able to view Firefighter Skinner's genital area. Firefighter Skinner testified that with regard to the SODAT employee's observation of him during the collection procedure, that "he just wouldn't back off." Trial Transcript, A–189–191.

### 6. Personnel Director Crosse

Personnel Director Crosse testified that he submitted himself to the SODAT specimen collection procedure as part of his pre-employment examination. Mr. Crosse testified that when he provided his urine sample the SODAT employee accompanied him into the bathroom and stood at the door while Mr. Crosse produced his specimen for collection.

### 7. Deputy Personnel Director William Yanonis

Deputy Director Yanonis testified that he also had a pre-employment drug test at SODAT and testified to a procedure similar to that experienced by Mr. Crosse. Mr. Yanonis testified that he was accompanied into the bathroom by a SODAT employee and that the SODAT employee stood behind Mr. Yanonis as he provided his sample. Trial Transcript, B–207–208.

As stated previously, the Plaintiffs and Defendants have drastically different interpretations as to what occurred during the collection procedures. Plaintiffs argue that the facts adduced at trial establish that the

direct supervision procedure employed by SODAT resulted in SODAT employees directly observing the firefighter's genital area during the collection procedure. The Defendants contend that SODAT's direct collection procedure did not involve the SODAT employees observing the firefighter's genital area and that the procedure involved a general supervision of the firefighter during the collection process.

On the evidence submitted by the parties, the Court finds that the direct supervision procedure employed by SODAT did not in principal or in fact involve the direct observation of the genital area of the person providing the urine sample. The relevant portion of the SODAT procedure provides:

> At this point the client is allowed to use the restroom to obtain urine specimen under direct supervision of counselor/authorized personnel.

Plaintiff's Exhibit 12, p. 2. This written procedure does not direct that the SODAT employee undertake to observe the genital area of the individual providing the sample. It only requires supervision during the collection process. In practice, it appears that the procedure was executed in a manner consistent with the written policy. The Court finds that the testimony of the two male firefighters is consistent with the testimony of Mr. Crosse and Mr. Yanonis. Specifically, all four individuals testified that the SODAT employee was positioned behind them as they stood at the urinal. From this admitted position, the Court finds it would be very difficult for the SODAT employee to actually or directly observe the genital area of the person providing the urine sample without significantly interfering with that effort. Similarly, the two female firefighters who testified at trial both testified that the SODAT employee stood to their side and in at least one instance the witness testified that the employee was an arms length away from the firefighter. Specifically, Firefighter Smith testified that the female SODAT employee who accompanied her into the bathroom was not positioned directly in front of her. The Court is convinced that the testimony concerning the position of the SODAT employee during the specimen collection is corroborated and demonstrates that genital observation was not the purpose nor the practice of the SODAT policy. In addition to the testimony of all witnesses being internally corroborative, the Court also credits the testimony of Susan McLaughlin, the Director of Administrative Services for SODAT. Ms. McLaughlin testified that the SODAT procedure for urine collection did not require the observation of the genitals of the person providing the sample. Ms. McLaughlin further testified that the positioning of the SODAT employee during the collection procedure was not directly in front of the firefighter. Trial Transcript, B–88, B–189. In sum, the Court finds that the consistent thread of evidence throughout the testimony of all witnesses and documents establishes the fact that the SODAT direct supervision collection procedure did not involve the observation of the provider's genital area but, rather, required only a general supervision of the specimen provider during the course of collection so as to avoid the possibility of tampering.

## C. *The Grievance Procedure*

Article 3, Section 3 of the Collective Bargaining Agreement ("CBA") provides a three step grievance procedure. The first step grievance requires the Union to file a written grievance, detailing violations of the CBA. The Deputy Chief of Operations then has five days to review the grievance and make a determination as to whether the CBA has been violated.

If the grievant is not satisfied with the outcome of the first step grievance, a second step hearing is held before the Director of Personnel and the Chief of Fire. The second step grievance is to be decided within five days. If the grievant is still dissatisfied with the result of the second step grievance, the grievant may pursue arbitration pursuant to Article 2, Section 8.

The third step grievance is heard before an appeal board consisting of three individuals: a representative appointed by the Chief of Fire, a representative appointed by the Union, and an impartial arbitrator appointed by the representatives. If the representatives cannot agree to an arbitrator, the

American Arbitration Association will appoint one. Notes of Testimony, Vol. A, A–51 through A–54; Brief of Defendant City of Wilmington's Proposed Findings of Fact & Conclusions of Law, pp. 5–6.

On January 17, 1994, SODAT began testing firefighters using random urinalysis with direct supervision. Immediately thereafter, the firefighters complained to the Union. The Union held a contract negotiation session with the Director of Personnel to resolve the problem without resorting to the grievance procedure. The parties were unable to reach an agreement. On January 26, 1994, the Union filed a first step grievance, citing violation of CBA Articles XXIV, XXVII and XXVIII.

On January 28, 1994, City and Union representatives went to the SODAT facility to observe the random drug testing procedure, firsthand. The City walked through the procedure with a SODAT representative. On February 2, 1994, five days after the first step grievance was filed, Deputy Chief Armstead denied the grievance, finding no violation of CBA Articles XXIV, XXVII and XXVIII.

On February 4, 1994, the Union filed a second step grievance, alleging a violation of CBA Articles XXIV, XXVII and XXVIII. On February 10, 1994, four days after the second step grievance was filed, Personnel Director Yanonis and Fire Chief James T. Wilmore held a hearing. At the hearing, Yanonis and Wilmore heard testimony from the Union that their constitutional rights were violated by SODAT's drug testing procedure. Specifically, the Union claimed that there was an oral agreement between the Union and the City to use a "dry room procedure" for urine collection.

On February 17, 1994, Yanonis and Wilmore determined that the CBA was not violated and denied the second step grievance. The same day, the Union filed a notice of arbitration with the City.

On March 18, 1994, the Union filed suit. On April 7, 1994, the City sent a letter to the director of SODAT instructing him to suspend direct observation. Plaintiff's Proposed Findings of Fact & Conclusions of Law, p. 20.

## II. *STANDARD OF REVIEW*

### A. *Legal Standard of Reasonableness*

■ It is well settled that drug testing of employees is a search under the Fourth Amendment. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In *Skinner v. Railway Labor Executives' Assn.,* the United States Supreme Court held that Federal Railroad Administration regulations requiring breath and urine tests of employees involved in major accidents or safety violations did not constitute unreasonable searches. *Skinner,* 489 U.S. 602, 633, 109 S.Ct. 1402, 1421, 103 L.Ed.2d 639 (1989). In assessing reasonableness, the Supreme Court adopted a balancing test of the individuals' privacy expectation with the Government's interest in conducting the test. *Id.* at 617, 109 S.Ct. at 1413. The Supreme Court noted that when special needs beyond normal law enforcement needs were involved, the warrant and probable cause requirements were impractical. Thus, the Court found in *Skinner* that the Government's interests in safety, fatalities and excessive property damage was a special need and outweighed the individuals' privacy interest. *Id.* at 619, 109 S.Ct. at 1414.

The balancing test formulated in *Skinner* was applied in *National Treasury Employees' Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In *Von Raab,* the Court held that suspicionless drug testing of employees applying for positions directly involving the interdiction of illegal drugs or carrying a firearm was reasonable. The Court reasoned that the Government's interest in preventing the promotion of drug users to positions that could endanger the nation's borders or lives of its citizens outweighed the individuals' privacy interest. *Id.* at 665, 109 S.Ct. at 1390.

In both these cases, employees were subjected to a urinalysis test. In *Von Raab,* the employee was permitted to provide a specimen in a bathroom stall or behind a partition with a monitor of the same sex close at hand

to listen for the normal sounds of urination. *Von Raab,* 489 U.S. at 663, 673 fn. 2, 109 S.Ct. at 1389, 1394 fn. 2. In *Skinner,* the procedure used was "to transport all crew members and other covered employees directly involved in the accident or incident to an independent medical facility where both blood and urine samples must be obtained from each employee." *Id.* at 609, 109 S.Ct. at 1409. "The regulations do not require that samples be furnished under the direct observation of a monitor despite the desirability of such a procedure to insure the integrity of the sample." (Citation omitted.) *Id.* at 626–27, 109 S.Ct. at 1418.

The Court of Appeals for the Third Circuit has held that an employee has a diminished expectation of privacy when he or she works in a highly/heavily regulated industry. *Policemen's Benevolent Association, Local 318 v. Washington Township,* 850 F.2d 133 (3d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989) (police industry is a quasi-military organization and the most heavily regulated industry in the state); *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986) (horseracing is a heavily regulated industry and participants such as jockeys have a diminished expectation of privacy). The Third Circuit has emphasized that an employer's random drug testing of an employee does not require individualized suspicion especially where the employee's duties and responsibilities can "cause great human loss before any signs of impairment become noticeable to supervisors or others." *Transport Workers Union of Philadelphia Local 234 v. SEPTA,* 884 F.2d 709, 712 (3d Cir. 1989). However, the Third Circuit refused to extend random drug testing to maintenance custodians. In *Bolden v. SEPTA,* 953 F.2d 807 (3d Cir.1991), the court reasoned that such employees do not have a diminished expectation of privacy because their jobs are not highly regulated nor do they pose a substantial risk of harm to others. *Id.* at 823.

Finally, when analyzing the reasonableness of a government regulation, the law is well settled that the· regulation is not unconstitutional simply because there exists a less intrusive alternative. *Illinois v. La-*

*fayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983). Thus, a drug testing program will not be determined unreasonable merely because there is another less intrusive method of collecting a specimen than direct observation.

### III. CONCLUSIONS OF LAW

The firefighters do not dispute the *fact* that they are randomly tested for illicit drugs. Indeed, the firefighters recognize that the rigors of their profession require them to be ready to save lives and property on a moments notice and, to do so, the firefighters recognize they must be in peak physical condition. For this reason, the firefighters have agreed to random drug testing because they want assurance that their fellow firefighters are drug free. The Union memorialized this policy and rationale in the Collective Bargaining Agreement. See CBA, Article XXVII, Section 1, *Alcohol and Controlled Substance Policy and Objective.*

However, the firefighters do contest the *way* in which they were tested. Plaintiffs contend that the SODAT collection method which utilizes direct supervision violates both the Collective Bargaining Agreement and their Constitutional rights.

### A. The Collective Bargaining Agreement

Plaintiff's contend that the direct supervision specimen collection procedure violates CBA Articles XXIV, XXVII, and XXVIII. However, a plain and thorough reading of these Articles, does not address the method to be utilized for the specimen collection procedure. Because the CBA so thoroughly details the rest of the drug testing scheme, the Court is persuaded that the firefighters' claim that there was a contemporaneous, oral agreement between the parties to use dry room testing is untenable.

Of the Articles cited by Plaintiffs, only Article 27 addresses the· drug testing policy. DX 4, p. 61. Article 27 Section 10 indicates that an individual in the Personnel Department will run a computer program each month in which 20 firefighters will be selected for drug testing. Those firefighters selected for testing will be advised to report to

the City Medical Dispensary. As to the specimen collection procedure, Section 10 provides only that the screening will be "performed under the auspices and/or guidance of the City of Wilmington." Thus, the Court concludes that the plain meaning of the Alcohol and Controlled Substance Policy leaves the collection method to the discretion of the City.

Likewise, Articles XXIV, Maintenance of Standards, and XXVIII, Physical Fitness Program do not address the issue of drug testing.

■ The Court finds that the City changed drug testing facilities for the nonarbitrary purpose of saving money. The Court finds that the City worked in good faith to resolve the dispute over the collection procedure by meeting with Union representatives to discuss the issue, by touring SODAT's facility and by complying with the Grievance Procedure. Despite the fact that the City won at both the first and second step grievance proceedings, the City agreed to request SODAT to halt the direct supervision collection procedure approximately two and a half months after its inception. On this record, the Court concludes that Defendants did not violate either the letter or spirit of the CBA.

**B.** *Constitutional Rights*

Next, Plaintiffs contend that Defendants violated their Fourth Amendment right to be free from unreasonable searches. Plaintiffs argue that the direct supervision procedure is overly intrusive and amounts to an invasion of privacy. Plaintiffs argue this is especially so in the case of urination, a private activity traditionally shielded from society. Plaintiffs contend that Defendants could and did employ a less intrusive means of sample collection with the dry room procedure. Plaintiffs argue that dry room testing was just as effective as direct supervision in preventing sample tampering.

Defendants do not dispute that direct supervision is more intrusive than dry room testing. Defendants contend that direct su-

pervision was a byproduct of attempting to standardize employee drug testing and reduce costs. Defendants argue that a direct benefit of contracting with SODAT was heightened sample scrutiny and more certainty as to tamper free urine samples.

■ The Court finds that firefighters like police officers work in a heavily regulated industry. See *Policemen's Benevolent Association, Local 318 v. Washington Township,* 850 F.2d 133 (3rd Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). As such, firefighters have a diminished expectation of privacy. The Court finds that firefighters can be pressed into service without prior notice and if impaired, could cause human loss before a supervisor was able to detect his or her impairment. See *Transport Workers Union of Philadelphia Local 234 v. SEPTA,* 884 F.2d 709, 712 (3rd Cir.1989). As in *Skinner,* the Court finds that the City has a compelling interest in limiting human fatalities and excessive property damage in the event of a fire.

Turning to the issue of the direct supervision collection procedure, the Court finds that use of a dry room is less intrusive than use of a monitor. On the other hand, the Court finds that use of a monitor better insures the integrity of the sample. The Court finds persuasive the testimony of Defendants' expert, Dr. Clossen, who testified that use of a dry room enables an employee to avoid detection in a variety of ways. Most obvious, Dr. Clossen testified that an employee could carry clean urine into the dry room and substitute it for his own. The Court finds that use of a monitor virtually eliminates this and other types of sample tampering.[2]

■ On a human level, the Court is mindful of the possible embarrassment one may feel at having to urinate in the presence of another. The Court notes that excretory functions are highly personal and generally should be afforded maximum privacy. Nevertheless, the Court finds that a direct supervision method while invasive is not by its nature constitutionally unreasonable. In

---

**2.** Dr. Clossen conceded that a monitor probably would not detect use of an artificial bladder taped to the employee's body with a flexible tube running from the bladder to the employees urethra. However, the Court finds that use of such an elaborate construct is highly unlikely.

*Transport Workers,* the Third Circuit determined that urine testing was reasonable because the procedure had sufficient safeguards: chain of custody, confidentiality, verification, and random selection. In this case, the Court concludes that SODAT's procedure employs all of these safeguards and adds one more—direct supervision.[3]

■ Thus, the Court concludes that a urine collection procedure which employs the element of a monitor does not violate the Fourth Amendment when balanced against the government interest of maintaining a corps of drug free firefighters.[4]

### IV. CONCLUSION

For the reasons discussed the Court will enter Judgment on both the Plaintiffs' federal and state law claims in favor of Defendants.

An appropriate Order will follow.

---

3. In *Skinner,* the Supreme Court noted the desirability of furnishing urine samples under the "direct observation of a monitor ... to ensure the integrity of the sample." *Skinner,* 489 U.S. at 626, 109 S.Ct. at 1418.

4. Plaintiffs also assert that their state law privacy right was violated by SODAT's direct supervision collection procedure. The Court need not reach this issue based on its findings and conclusion that direct observation supervision is constitutional.