

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-1998

# Wilcher v. Wilmington

Precedential or Non-Precedential:

Docket 96-7276

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"Wilcher v. Wilmington" (1998). *1998 Decisions.* Paper 51.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/51

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 17, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7276

BEVERLY WILCHER; SHARON SMITH; MICHAEL
DANYLO; CORNELIUS SKINNER, on behalf of themselves
and all others similarly situated; THE WILMINGTON FIRE
FIGHTERS ASSOCIATION, LOCAL 1590,

      Appellants,

v.

CITY OF WILMINGTON; JAMES A. SILLS, in his official
capacity as Mayor of the City of Wilmington; JAMES  T.
WILMORE, SR., individually and in his official capacity as
Chief of Fire for the City of Wilmington; CLIFTON  E.
ARMSTEAD, individually and in his official capacity as
Deputy Chief of Fire for the City of Wilmington;
S.A. WAYNE CROSSE, in his official capacity as Dir ector
of Personnel for the City of Wilmington; WILLIAM J.
YANONIS, individually and in his official capacity as
Deputy Director of Personnel for the City of Wilmington

SODAT-DELAWARE, INC.,

      Third-Party Defendant

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 94-cv-00137)

Argued January 28, 1997

Before: BECKER, Chief Judge, and ROTH, Circuit Judges,
and ORLOFSKY,1 District  Judge

(Opinion Filed March 17, 1998)

        Teresa C. Fariss, Esq. (Argued)
        Young, Conaway, Stargatt & Taylor
        P.O. Box 391
        Rodney Square North, 11th Floor
        Wilmington, DE 19899-0391

         Attorney for Appellants

        John W. Morgan, Esq. (Argued)
        City of Wilmington
        Law Department
        800 French Street, 9th Floor
        Wilmington, DE 19801

         Attorney for Appellees

        Bruce C. Herron, Esq. (Argued)
        Sawyer, Akin & Herron
        1220 North Market Street
        P.O. Box 25047, Suite 606
        Wilmington, DE 19899

         Attorney for Third-Party Defendant

OPINION OF THE COURT

ROTH, Circuit Judge:

In this appeal, we are asked to determine whether the
City of Wilmington's method of testing firefighters for drug
use violates their rights under the Fourth Amendment. We
will affirm the district court's conclusion that it does not.
_____

1. Honorable Stephen M. Orlofsky, United States District Court Judge for
the District of New Jersey, sitting by designation.

2

Nevertheless, we will remand the case for reconsideration of the state law invasion of privacy claim.

Beverly Wilcher, Sharon Smith, Michael Danylo and Cornelius Skinner are Wilmington firefighters. Along with the Wilmington Fire Fighters Association (WFFA), they brought this class action on behalf of all firefighters in the city. The defendants are the City of Wilmington, Mayor Sills (in his official capacity), James T. Wilmore (individually and in his capacity as Fire Chief), Clifton Armstead (individually and in his official capacity as Deputy Fire Chief), Wayne Crosse (in his official capacity as Director of Personnel for Wilmington), and William Yanonis (individually and in his official capacity as Deputy Director of Personnel). In addition, the firefighters sued SODAT-Delaware, Inc., the drug testing company that performs the tests for the City of Wilmington. The firefighters sought injunctive relief and damages under 42 U.S.C. S 1983 and damages for "invasion of privacy" under the state's tort law.

The district court granted summary judgment in favor of the individual defendants on the ground that they were entitled to qualified immunity and in favor of the SODAT defendants on the ground that SODAT was not a state actor. The district court then held a three-day trial. Two days into the trial, the plaintiffs apprised the district court of this Court's statement in Bolden v. SEPTA, 953 F.2d 807, 822-23 n.23 (3d Cir. 1991), that reasonableness under the Fourth Amendment was an issue of law. Concluding that there were no remaining factual issues for the jury to decide, the district court, with the plaintiffs' acquiescence, dismissed the jury. The court then decided against the plaintiffs on the merits of their Fourth Amendment claim. See Wilcher v. City of Wilmington, No. 94-137, slip. op. (D.Del. June 30, 1995). The district court also concluded that plaintiffs could not prevail on their state law invasion of privacy claim. The district court eventually elaborated on its findings in a memorandum opinion rejecting the plaintiffs' motion for reargument and for a new trial. See Wilcher v. City of Wilmington, 924 F.Supp. 613 (D.Del. 1996).

The firefighters have appealed on several grounds. First, they cite as error the district court's failure to enter an

3

injunction permanently prohibiting the City from using the direct observation method in its urine collecting, despite the fact that during a pre-trial teleconference the City had tentatively agreed to such an arrangement. Second, they dispute the district court's conclusion that direct observation of urine collection is reasonable under the Fourth Amendment. Third, they appeal the district court's determinations regarding qualified immunity and state action. Fourth, they urge that, in denying the plaintiffs a jury trial, the district court misapplied our decision in Bolden. Finally, the plaintiffs contend that the district court committed error when it presumed that the reasonableness standard under the Fourth Amendment of the Constitution was equivalent to the reasonable person standard under Delaware tort law.2

We will reject all the plaintiffs' grounds for appeal except for the fifth one. The district court did not abuse its discretion when it denied plaintiffs' motion for injunctive relief, following the City's rejection of the tentative agreement. In addition, we agree with the district court that a drug testing monitor's presence in the same room with the firefighter during the collection of thatfirefighter's urine does not, by itself, constitute an unreasonable search under the Fourth Amendment. As for the plaintiffs' jury trial right, we agree that the district court misread our decision in Bolden when it concluded that no factual

_____

2. The plaintiffs also contend that the district court should not have determined that SODAT's drug testing method was not in violation of the firefighters' Collective Bargaining Agreement with the City. See Wilcher, at 17-19 (June 30, 1996 Memorandum). According to the plaintiffs, this issue was moot by the close of the trial because the City had agreed at least temporarily to discontinue using the method. Because the City has explicitly reserved its right to use this procedure in the future, we do not
agree that this issue is "moot." Moreover, the City has never conceded the impermissibility of SODAT's drug testing procedure under the Collective Bargaining Agreement with the firefighters. Nevertheless, we agree that this issue should not have been decided by the district court. The plaintiffs never raised the Collective Bargaining Agreement in the pleadings. Moreover, when the case was tried, plaintiffs had not yet exhausted their administrative remedies, such as arbitration. Therefore, the issue was not properly before the district court, and we will vacate the district court's ruling on it.

4

determinations remained for the jury. Nevertheless, we will not reverse the district court's dismissal of the jury because the plaintiffs clearly acquiesced in this action and thereby waived their jury right under Rule 39(a) of the Federal Rules of Civil Procedure.

However, despite our affirmance of the district court's constitutional analysis, we will remand this case for further proceedings because we believe the court erred in presuming the equivalence of the "reasonableness" inquiry under the Fourth Amendment and the "reasonable person" standard under the common law in an invasion of privacy claim.

I. FACTS

In July 1990, the City and the Wilmington Fire Fighters Association (the firefighters' union) agreed in a Collective Bargaining Agreement that firefighters would be subject to random drug testing through urinalysis in order to ensure that members of the Fire Department were drug free. Prior to January 1994, the City had employed a procedure whereby a randomly selected firefighter was notified he would be tested when he arrived at the station to begin his shift. A battalion chief would then stay with the firefighter and take him to Occupational Health Services at the Medical Center of Delaware ("Occupational Health") where the test was performed. There, the battalion leader would conduct the firefighter to a "dry room" to produce the urine specimen. The sink in the dry room did not contain water and the toilet bowl contained blue dye to prevent cheating by dilution. The firefighters provided their urine specimens in private; no observer was present in the dry room. Occupational Health's method of collecting urine in this manner followed the guidelines of the National Institute of Drug Abuse.

In November 1993, in an attempt to reduce the cost of random drug testing, the City solicited bids from drug testing facilities. The City did not specifically request a procedure which included visual observation of urine collection. SODAT, a private drug-testing company in Delaware with a primary focus on outpatient drug-

counseling, submitted a proposal under which fire-fighters would produce the urine sample "under the direct supervision of counselor/authorized personnel." The City accepted SODAT's bid.

In January 1994, SODAT began drug testing the City's firefighters. The parties have given substantially different descriptions of how the SODAT employees carried out this procedure. The male firefighters, for example, claim that the SODAT monitor looked over the firefighter's shoulder at his genitals while he urinated. SODAT, on the other hand, claims that the monitors stood to the back or the right of the firefighters but did not directly observe their genitalia.

Although SODAT employees are directed to observe the urine collection process by looking in the firefighter's general direction as he or she commences urination, the monitors are neither directed nor expected to focus on the firefighter's genitals. At trial, the SODAT monitors maintained that they had acted within the company's guidelines.

After hearing this testimony, the district court accepted SODAT's portrayal of the monitoring process as accurate. "An examination of the SODAT testing program, both in terms of its design and intent, and more specifically in its execution, demonstrates that no element of the program was intended to invade the privacy of a firefighter in an overly intrusive manner." Wilcher, 924 F.Supp. at 617. The district court further stated, "Although [the collection process] may have involved some observation of the genitalia area generally, this observation was only a by-product of the general observation of the donor." Id. at 618. In its earlier memorandum, the district court had also stated:

> On the evidence submitted by the parties, the Court finds that the direct supervision procedure employed by SODAT did not in principal or in fact involve the direct observation of the genital area of the person providing the urine sample. . . . [SODAT's procedure] does not direct that the SODAT employee undertake to observe the genital area of the individual providing the sample. It only requires supervision during the collection process.

6

Wilcher, slip. op. at 11. The district court further concluded, "The Court is convinced that the testimony concerning the position of the SODAT employee during the specimen collection is corroborated and demonstrates that genital observation was not the purpose nor the practice of the SODAT policy." Id.

Soon after SODAT began testing firefighters, the Deputy Fire Chief was informed of the firefighters' complaints about SODAT's testing method. The City did not, however, request that SODAT stop using the direct observation procedure. The firefighters' union, the Wilmington Fire Fighters Association, filed a first step grievance with the City of Wilmington protesting the direct observation procedure. The Deputy Chief denied this grievance. The WFFA filed a second step grievance, which was denied on February 17, 1994. The WFFA then filed a Notice of Arbitration. The plaintiffs filed suit on March 18, 1994, against the City and the individual defendants. The City impleaded SODAT, and the plaintiffs amended their complaint to include SODAT as a defendant. In an Order and Stipulation filed on April 15, 1994, the parties agreed that the City should direct SODAT to refrain from using direct observation of urination while this case was pending.

The district court had jurisdiction over this case pursuant to 28 U.S.C. SS 1331 and 1343. We now have jurisdiction under 28 U.S.C. S 1291.

II. THE "TENTATIVE AGREEMENT"

Before we proceed with our analysis of the constitutional issue, we will address the plaintiffs' contention that the district court erred in not permanently enjoining the City from using SODAT's direct observation method of drug testing. We find no such error.

On April 15, 1994, the parties filed a Stipulation and Order temporarily enjoining the City from further use of the direct observation method during the pendency of this case. On June 16, the parties participated with the district court in a teleconference, during which the City expressed its willingness to refrain permanently from using the direct observation method. At the end of the teleconference,

SODAT's counsel stated that she would draft a stipulation and order to that effect and send it around to the other parties for their signature.

Despite this tentative agreement, the plaintiffs and the City of Wilmington were unable to arrive at an accord on the terms of the stipulation. The City therefore refused to sign it. The plaintiffs then filed a motion with the district court for an order permanently enjoining the City and SODAT from further use of the direct observation method of urine collection. The district court denied this motion without opinion on March 31, 1995. The plaintiffs argue that this denial was error, as the City defendants had reneged on their agreement in bad faith. The defendants reply that the oral agreement was only tentative.

As a general rule, we encourage attempts to settle disagreements outside the litigative context. A settlement agreement is a contract and is interpreted according to local law. See Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 79 (3d Cir. 1982). A district court may enter injunctive relief on a party's behalf to enforce a settlement agreement when it determines that one of the parties has failed to perform its obligations. See Read v. Baker, 438 F.Supp. 732, 735 (D. Del. 1977), citing Petty v. General Accident Fire & Life Assurance Co., 365 F.2d 419, 421 (3d Cir. 1966). The power to grant or deny an injunction, however, is firmly within the discretion of the district court. See Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 943 (3d Cir. 1993).

According to the City, the district court did not abuse its discretion by denying the injunction because the parties had produced no more than a tentative agreement, unenforceable by law. We agree. Under Delaware law, the criteria for deciding whether a contract exists is the intention of the parties, evidenced by their objective conduct and manifestations. See Industrial America, Inc. v. Fulton Indus., Inc., 285 A.2d 412, 415 (Del. 1971). The parties' subjective intent is irrelevant. Id. Rather, the court's inquiry is "whether a reasonable man would, based upon the `objective manifestation of assent' and all of the surrounding circumstances, conclude that the parties intended to be bound by contract." Leeds v. First Allied

8

Connecticut Corp., 521 A.2d 1095, 1101 (Del.Ch. 1986). As Chancellor Allen has noted,

> This is not a simple or mechanical test to apply. Negotiations typically proceed over time with agreements on some points being reached along the way towards a completed negotiation. It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed.

Leeds, 521 A.2d at 1101 (emphasis added). The Chancellor further stated, "Until it is reasonable to conclude . . . that all of the points that the parties themselves regard as essential have been expressly or . . . implicitly resolved, the parties have not finished their negotiations and have not formed a contract." Id., at 1102.

These basic principles of contract law lead us to conclude that the district court committed no abuse of discretion in denying injunctive relief. Although the parties agreed in principle at the pre-trial teleconference to a stipulation permanently halting the direct observation procedure, they did not discuss the details of the agreement. Thus, we cannot say that all the essential terms were resolved before or during the teleconference. The teleconference represented but one step of a complex negotiation between three parties (the firefighters, the City, and SODAT). The record indicates that the City made a good faith effort to work with the plaintiffs to draft a stipulation acceptable to everyone. Unfortunately, the parties never reached that stage. This failure, however, does not represent a breach of contract. Accordingly, we will affirm the district court's denial of the permanent injunction.

III. THE CONSTITUTIONALITY OF
DIRECT OBSERVATION

The gravamen of the plaintiffs' complaint is that the direct observation method of urine collection violates the firefighters' right under the Fourth Amendment, as incorporated by the Fourteenth Amendment, to be free from unreasonable searches and seizures. The district court held that the direct observation method, as executed by SODAT,

9

did not constitute an "unreasonable" search. Because the reasonableness of a search under the Fourth Amendment is an issue of law, we exercise plenary review. See Bolden, 953 F.2d at 822-23 n.23; Dykes v. SEPTA, 68 F.3d 1564, 1568 (3d Cir. 1995).

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. It is well established that the government's collection and testing of an employee's urine constitutes a "search" under the Fourth Amendment. Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 617; Treasury Employees v. Von Raab, 489 U.S. 656, 665 (1989). Ordinarily, the Constitution requires the government to obtain a warrant supported by probable cause to search a person or his property. There are, however, several well-established exceptions to the warrant and probable cause requirements. The Supreme Court has explained:

> [O]ur cases establish that where a Fourth Amendment intrusion serves special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

Von Rabb, 489 U.S. at 665-66. See also Griffin v. Wisconsin, 483 U.S. 868, 873 (1987); New Jersey v. T.L.O., 469 U.S. 325, 340 (1985). Under the "special needs" analysis, the government need not show probable cause or even individualized suspicion for its search. Instead, it must prove that its search meets a general test of "reasonableness." Under this standard, the constitutionality of a particular search " `is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " Skinner, 489 U.S. at 619 (quoting Delaware v. Prouse, 440 U.S. 648, 654 (1979)). In particular, the Supreme Court's jurisprudence directs us to consider three factors when judging the constitutionality of employee drug tests: (1) the nature of the privacy interest upon which the search intrudes; (2) the extent to which the search intrudes on the

10

employee's privacy; and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means employed by the government for meeting that concern. Vernonia School Dist. 47J v. Acton, 115 S.Ct. 2386 (1995).

The firefighters do not dispute the reasonableness of compulsory drug testing per se. To the contrary, the firefighters have agreed to drug testing in their Collective Bargaining Agreement with the City. Rather, the plaintiffs challenge the City's method of testing, which entails visual observation of the firefighters as they provide their urine samples. This issue has been described as "distinct and clearly severable from those that govern reasonable suspicion testing generally". National Treasury Employees Union v. Yeutter, 918 F.2d 968, 975 (D.C. Cir. 1990). For this reason, we apply the Fourth Amendment's reasonableness test solely to the direct observation method utilized by SODAT and not to the broader issue of compulsory drug testing. See id.3

A. The Nature of the Firefighters' Privacy Interest

"Reasonableness" entails a three pronged inquiry. First, a court examines the individual's privacy interest upon which the search at issue allegedly intrudes. See Vernonia, 115 S.Ct. at 2391 (1995). This expectation of privacy must be legitimate as measured by objective standards. "The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as `legitimate.' " Id.

The district court properly concluded that firefighters enjoy only a diminished expectation of privacy. "Because they are in a highly regulated industry, and because they had consented to random testing in their collective bargaining agreement, the firefighters had a reduced privacy interest." Wilcher, 924 F.Supp. at 618. Plaintiffs now argue on appeal that the firefighting industry is not

_____

3. Because it is the method of testing, rather than the fact of testing, which is at issue, we do not find that appellants' post-argument citation to Chandler v. Miller, 117 S.Ct. 1295 (1997), is helpful to our considerations here.

"highly regulated" and that the firefighters therefore did not have a diminished expectation of privacy.

Plaintiffs' argument lacks merit. Even though extensive regulation of an industry may diminish an employee's expectation of privacy, see Policemen's Benevolent Ass'n, Local 318 v. Township of Washington, 850 F.2d 133 (3d Cir. 1988) (police department described as "highly regulated"); Shoemaker v. Handel, 795 F.2d 1136 (3d Cir. 1986) (upholding law requiring jockeys to submit to breathalyser and random urinalysis testing), we have never held that regulation alone is the sole factor that determines the scope of an employee's expectation of privacy. It is also the safety concerns associated with a particular type of employment -- especially those concerns that are well-known to prospective employees -- which diminish an employee's expectation of privacy. Supreme Court precedent demonstrates this principle. In National Treasury Employees v. Von Raab, the Court held that a government employee's expectation of privacy depended in part on the nature of his employment and whether it posed an attendant threat to public safety. See 489 U.S. at 672. Upholding the drug testing of customs officials, the Court explained:

> We think Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test. Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity . . . . Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep . . . personal information that bears directly on their fitness.

Id. (emphasis added). Customs officials enjoyed a reduced expectation of privacy because of the sensitive nature of their duties and of the information they received. We have held that railway employees also enjoy a diminished expectation of privacy because of the safety concerns

12

associated with those who operate trains. See e.g. Transport Workers' Union, Local 234 v. SEPTA, 884 F.2d 709, 712 (3d Cir. 1988) (random testing of rail operators upheld because of "great human loss" they can cause prior to detection of drug problem).

Certainly, a firefighter with a drug problem poses as great a threat to public safety as does a customs official or a rail operator. A firefighter whose drug use is undetected is a source of danger both to his colleagues and to the community at large. In addition, the firefighter puts himself at great risk of harm. Since the perils associated with firefighting are well known, we have no trouble concluding that firefighters enjoy a diminished expectation of privacy. Our inquiry, however, does not end here, as we must balance the firefighters' diminished interest with the character of the search at issue and with the concerns that have propelled that search.

B. The Character of the Search

The second factor we must consider is the character of the government's search and the extent to which it intrudes on the employee's privacy. The Supreme Court has held that the degree of intrusion "depends upon the manner in which production of the urine sample is monitored." Vernonia, 115 S.Ct. at 2393. Before we judge the intrusiveness of SODAT's drug testing method, however, we must first determine what that method actually entails.

At trial and on appeal, both the plaintiffs and the SODAT employees have presented highly divergent pictures of the urine collection process. The firefighters claim that monitors looked at their genitalia as they urinated. SODAT and its employees, on the other hand, steadfastly maintain that they did not focus on the firefighters' genitalia during the urine collection process. Instead, they claim that they looked in the firefighters' general direction to ensure that no tampering was taking place during the production of the urine specimen.

Based on the evidence before it, the trial court concluded that SODAT's drug testing procedure involved only the monitors' direct observation of the urine collection process in general and not the intentional observation of the

13

firefighters' genitalia. Wilcher, 924 F. Supp. at 617-18. We accept as accurate the district court's finding of fact concerning the nature of the urine collection process employed by SODAT. Although the reasonableness of a search is a legal question, the particular character of that search is a factual matter. Cf. O'Connor v. Ortega, 480 U.S. 709, 726-729 (factual dispute regarding character of search precluded lower court's grant of summary judgment on Fourth Amendment issue). As such, the trial judge's factual finding regarding the character of SODAT's drug testing procedure is reversible only if it is clearly erroneous. See Marco v. Accent Pub. Co., Inc., 969 F.2d 1547, 1548 (3d Cir. 1992). In light of the nature of the testimony from the SODAT employees, which the trial judge chose to credit, we cannot say that the district court's finding was clearly erroneous.[4] Consequently, we will adopt the district court's description of the SODAT procedure as one which entails only incidental observation of a firefighters' genitals.

Having adopted the district court's description of the SODAT drug-testing procedure, we must concede that the direct observation method represents a significant intrusion on the privacy of any government employee. Urination has been regarded traditionally by our society as a matter "shielded by great privacy." Skinner, 489 U.S. at 626; 109 S.Ct. at 1418. Few cases have dealt with the issue of the specific method used by the government to test its employees for drugs. In Vernonia School District 47J v. Acton, the Supreme Court upheld the constitutionality of a mandatory random drug testing program that a school district employed to reduce drug use among its student athletes. The Court described the Vernonia drug testing procedure in the following manner:

> The student to be tested completes a specimen control
> form which bears an assigned number. . . . The
> student then enters an empty locker room
> accompanied by an adult monitor of the same sex.
> Each boy selected produces a sample at a urinal,

_____

4. In addition, we note the concession of plaintiffs' attorney at oral argument that she was not seeking reversal of the trial court's factual findings.

14

> remaining fully clothed with his back to the monitor, who stands approximately 12 to 15 feet behind the student. Monitors may (though do not always) watch the student while he produces the sample, and they listen for normal sounds of urination. Girls produce samples in an enclosed bathroom stall, so that they can be heard but not observed.

Vernonia, 115 S.Ct. at 2389. The Supreme Court concluded that this method of testing was not unreasonable under the Fourth Amendment. "Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible." Vernonia, 115 S.Ct. at 2393.

Relying on Vernonia, the district court stated, "The Court finds the SODAT collection method no more intrusive on the firefighters' privacy than was the high school's drug testing program found to be constitutional in [Vernonia]" Wilcher, 924 F. Supp. at 618. The district court further concluded, "The presence of monitors in the bathrooms with firefighters is similar to the presence of the monitors in Vernonia, and even though the monitors may have stood closer than those in Vernonia, this close proximity was a result of the collection facilities, in this case a bathroom as opposed to a locker room, and not a more intrusive method." Wilcher, 984 F.Supp. at 619.

We agree with the district court insofar as its analogy to Vernonia applies to male firefighters. In a world where men frequently urinate at exposed urinals in public restrooms, it is difficult to characterize SODAT's procedure as a significant intrusion on the male firefighters' privacy.[5] Plaintiffs fail to demonstrate how the presence of a monitor in a boys locker room while a student athlete urinates differs significantly from the presence of a monitor in a bathroom while an adult firefighter urinates. Both monitors stand behind the individual providing the urine specimen. Similarly, as the district court found, both monitors observe only the collection process generally and not the particular

_____

5. See also Dimeo v. Griffin, 943 F.2d 679, 682 (7th Cir. 1991) (noting that "[u]rination is generally a private activity in our culture, though, for
most men, not highly private.")

individual's genitalia. The only difference is the distance between the monitor and the person producing the specimen. We cannot conclude that this difference by itself justifies a determination that SODAT procedure is unreasonable.6

We must admit that we are more cautious about the reasonableness of the direct observation method as it applies to female firefighters. We simply cannot characterize the presence of a monitor in a bathroom while a female urinates as an ordinary aspect of daily life. Indeed, Vernonia noted with approval the fact that female student athletes provided urine behind a stall as monitors stood outside listening. Vernonia, 115 S.Ct. at 2393. Nevertheless, nothing in Vernonia suggests that the presence of a female monitor in a bathroom when an adult female firefighter provides a urine specimen is per se unconstitutional under the Fourth Amendment. Moreover, the facts of this case suggest that SODAT took substantial measures to minimize the intrusion of privacy to female firefighters caused by the direct observation procedure. The district court found that the female monitors stood to the side of the female firefighters and that the monitors did not look at the firefighters' genitalia as they urinated, but rather in their general direction. Wilcher, 924 F.Supp. at 617–18. Finally, SODAT provided a nurse–practitioner as a monitor for plaintiff Wilcher when she expressed discomfort with her first female monitor. Thus, although wefind SODAT's intrusion of the female firefighters' privacy to be significant, we nevertheless agree with the defendants that SODAT has carried out its testing procedure in an appropriate and professional manner.

C. The Governmental Concern

The third and final component of the "reasonableness" test under the Fourth Amendment is the government's

_____

6. We note that our conclusion might differ had the district court accepted the firefighters' testimony that SODAT's monitors looked over firefighters' shoulders as they provided their urine specimens. Similarly, we would be much more concerned with a procedure's intrusion on privacy if it required the monitor to stand in front of the firefighter, or if it demanded the direct observation of the firefighter's genitalia.

16

interest, which must be compelling. With regard to this prong, the Supreme Court has observed:

> It is a mistake . . . to think that the phrase `compelling state interest,' in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest which appears important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy.

Vernonia, 115 S.Ct. at 2394-95. Thus, "compelling interest" does not have the same meaning in this context as it does in other areas of constitutional law. Moreover, the fact that there exists a less intrusive method of achieving the government's goal is not relevant to the Court's reasonableness analysis under the Fourth Amendment. Vernonia, 115 S.Ct. at 2396. See also Skinner, 489 U.S. at 629 n.9; Illinois v. Lafayette, 462 U.S. 640, 647 (1983).

In this case, we do not review the constitutionality of drug-testing per se, but rather, the procedure by which firefighters are tested. According to the City and to SODAT, visual observation is necessary to prevent cheating. At trial, the defendants' expert, Dr. Closson, testified that visual monitoring is necessary to catch employees who attempt to fool the test by substituting someone else's urine or adding a chemical adulterant to their own urine.

On appeal, the plaintiffs argue that cheating can be detected by testing the urine's temperature since substitutes make the specimen colder than it should be. According to Dr. Closson, a forensic toxicologist, cheaters still can avoid detection by warming substitute urine through a heating pack hidden on their body, or by keeping the urine close to their body so that it takes on the body's temperature. Closson further maintained that direct observation was the most accurate collection method for ensuring the integrity of a urine sample. Finally, Closson testified that direct observation procedures are used by the New York City Police Department, the New York City

17

Department of Corrections, and several other New York agencies.

Like the district court, we find the defendants' expert testimony persuasive. Cheating is a significant concern. The City understandably wishes to take as many steps as possible to eliminate potential violations of the drug testing program. The plaintiffs argue that the cheating described by Dr. Closson is unlikely, as Wilmington firefighters do not receive notice that they are to be tested until the day of the test, and they remain in the company of a superior officer from the moment they are notified of the test until the time that they actually provide their urine specimen. Although this argument is strong, it does not prove that the incidences of cheating, described by Dr. Closson, are impossible or even implausible. Although such cheating calls for fairly sophisticated equipment, it is possible for a firefighter with a drug problem to carry a catheter or an artificial bladder taped to his body on the days following drug use, just in case he is tested on that day. Indeed, Dr. Closson stated that cheating has been known to take place within the New York agencies, which use the direct observation method.

Under Supreme Court jurisprudence, the City of Wilmington need not wait for a cheating problem to develop in order to justify its use of direct observation. In Von Raab, for example, Justice Scalia noted that the Supreme Court upheld random mandatory drug testing of customs officials, even though there existed no evidence of a history of drug abuse among those government employees. See Von Raab, 489 U.S. at 679 (Scalia, dissenting). Moreover, the fact that there exists a less intrusive method of achieving the government's goal is not relevant to the Court's Fourth Amendment analysis. Skinner, 489 U.S. at 629 n.9; Illinois v. Lafayette, 462 U.S. 640, 647 (1983).

Finally, we do not agree with the plaintiffs' argument that SODAT renders its direct observation procedure ineffective (and thereby unnecessary) by directing monitors not to look at the firefighters' genitals. Certainly, the mere presence of a monitor in the room where the firefighter is urinating deters a would-be-cheater from substituting or adulterating his own urine sample. Thus, we must agree with the

18

district court that the direct observation procedure serves the government's interest of preventing cheating on drug tests.

Because we find that SODAT's direct observation method, as described in the district court's findings of fact, meets the three elements of the Fourth Amendment reasonableness test, we hold that the plaintiffs' Fourth Amendment rights have not been violated.[7] The City's significant interest in preserving the integrity of its firefighters' drug tests outweighs their expectations of privacy. With regard to the male firefighters, the conditions created by SODAT do not differ significantly from the conditions present in an ordinary public restroom. As for the female firefighters, we note the district court's finding that SODAT has taken several steps to minimize the potentially intrusive effects of having a person present in the same room during the collection of a femalefirefighter's urine. So long as SODAT's monitors refrain from looking at the firefighters' genitalia, its direct observation procedure remains within the boundaries of a constitutional search. Accordingly, the district court did not err when it ruled in the defendants' favor on the issue of constitutionality under the Fourth Amendment.[8]

IV. WAIVER OF JURY TRIAL

Two days into the trial, the plaintiffs brought to the district court's attention our statement in Bolden v. SEPTA that reasonableness under the Fourth Amendment was an issue to be decided by the judge. See Bolden, 953 F.2d at 822. Based on its reading of Bolden, the district court, with

_____

7. We note that the D.C. Circuit has come to the opposite conclusion with regard to this issue. See Piroglu v. T.R. Coleman, 25 F.3d 1098 (D.C. Cir. 1994); National Treas. Employees v. Yeutter, 918 F.2d 968, 976 (D.C. Cir. 1990). These cases, however, were decided prior to the Supreme Court's decision in Vernonia.

8. Because we affirm the district court's disposition of plaintiffs' Fourth
Amendment claim, we need not review either the district court's determination that SODAT was not a state actor, or its conclusion that the City defendants, as sued in their individual capacities, were entitled to qualified immunity.

19

plaintiffs' agreement, dismissed the jury. Plaintiffs now claim that this was error and that the district court violated their right to a jury trial. We reject this argument as lacking merit. Although plaintiffs had a right to a jury trial, they waived that right when they acquiesced in the district court's dismissal of the jury.

> Rule 39(a) of the Federal Rules of Civil Procedure states:
> When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury unless (1) the parties or their attorneys of record, by written stipulationfiled with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

Fed. R. Civ. P. 39(a) (emphasis added). This Court has stated that once a party makes a timely demand for a jury trial, that party subsequently waives that right when it participates in a bench trial without objection. See Cooper v. Loper, 923 F.2d 1045, 1049 (3d Cir. 1991). Numerous courts have adopted this position. See generally 5 James Wm. Moore et al., Moore's Federal Practice, P39.03 n.5-6 (2d ed. 1988) (consent can be inferred from conduct of parties or counsel). See also Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011 (2d Cir. 1989) (plaintiff waived right to jury trial in securities action by participating in bench trial without objection); Pope v. Savings Bank of Puget Sound, 850 F.2d 1345, 1355 (9th Cir. 1988) (counsel's agreement with court's announced intent to dismiss jury, as well as actual knowledge that jury was being discharged, constituted waiver of jury trial right under Rule 39(a)).

Based on these principles, we find that the plaintiffs waived their jury trial right under Rule 39(a). On the third day of trial, the plaintiffs' attorneys submitted a letter to the district court notifying it that under Bolden the issue of reasonableness under the Fourth Amendment was a legal

20

issue for the court. In response to this letter, the trial judge stated his intention to dismiss the jurors because there remained no liability questions for them to decide. The plaintiffs' counsel objected to this course of action only insofar as damages were concerned. The court agreed that, should the plaintiffs prevail on any of the liability questions, he would either recall the jury or assemble a new one to hear evidence relating to damages.

Based on the dialogue between the district judge and the plaintiffs' attorney, we conclude the plaintiffs waived their jury trial right under Rule 39(a). The sole concern of the plaintiffs' attorney was that the trial court preserve the damages issue for a jury trial in the future. She did not argue that the plaintiffs were entitled to a jury on the invasion of privacy claims. Nor did she argue that the plaintiffs were entitled to a jury verdict on the factual aspects of their Fourth Amendment claim (such as whether the SODAT employees actually looked at the firefighters' genitals while they urinated). Hence, whatever rights the plaintiffs had, their counsel waived when she explicitly agreed with the district court's decision to dismiss the jury.9

V. FOURTH AMENDMENT "REASONABLENESS" VS. THE
        STATE LAW "REASONABLE PERSON" STANDARD

Finally, we will reverse the district court's ruling insofar

_____

9. Although the plaintiffs waived their jury trial rights, we nevertheless note that the district court misapplied our statement in Bolden when it concluded that there were no factual issues for the jury to decide. The fact that reasonableness under the Fourth Amendment is a legal issue does not make all issues under the Fourth Amendment legal in nature.

For example, in Dykes v. SEPTA, 68 F.3d 1564, 1568 (3d Cir. 1995), we addressed a claim that SEPTA had violated its own drug-testing policy by testing the plaintiff without reasonable suspicion. Reiterating our statement in Bolden, we held that the specific question of whether SEPTA had reasonable suspicion to test the plaintiff (i.e. evidence that he might be using drugs) was factual. See 68 F.3d at 1567. Thus, our statement in Bolden applied only to the ultimate determination of whether SODAT's drug testing procedure qualified as "reasonable" under the Fourth Amendment, not to any determination of the factual elements of that procedure.

21

as it equated the Fourth Amendment "reasonableness" standard with the much different common law "reasonable person" standard. Invasion of privacy is a tort claim under state law. Delaware adopted the Restatement of Tort's definition of this claim in Barbieri v. News-Journal Co., 189 A.2d 773, 774 (Del. 1963). Under the Restatement, plaintiffs can prove a common law invasion of privacy if they show that defendants intentionally intruded on the firefighters' physical solitude or private affairs or concerns in such a manner that a reasonable person wouldfind "highly offensive." (Restatement (Second) of Torts, S 652B (1977)). See also Barker v. Huang, 610 A.2d 1341, 1350 (Del. 1992).

The district court concluded that since it had ruled against plaintiffs on their constitutional claim, it could not possibly find in their favor on their state law invasion of privacy claim. "Even assuming that the monitors intruded upon the firefighters' solitude, the Court has determined that the collection procedures used by SODAT were reasonable under constitutional principles." Wilcher, 924 F.Supp. at 619.

The district court's assumption that "reasonableness" under the Fourth Amendment is analogous to a "reasonable person" standard under state common law is erroneous. A state may provide its citizens with greater protection of their individual rights than does the federal constitution. For example, in Kelley v. Schlumberger Technology Corp., 849 F.2d 41 (1st Cir. 1988), the court struck down a drug testing procedure because it violated the state constitution. Moreover, it is beyond argument that a district court cannot, a fortiori, apply a federal standard of law to a cause of action grounded in the common law of the state in which it sits. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Hence, the trial court incorrectly concluded, as a matter of law, that a reasonable Delawarean could not find the drug testing procedure "highly offensive," simply because the test might have passed muster under the Fourth Amendment.10 We will therefore remand this issue

_____

10. The district court also dismissed the plaintiffs' invasion of privacy claims because, "the `intrusion into physical solitude' claimed by the

22

to the district court to determine whether the "reasonable person" standard under Delaware common law wouldfind the practices employed by SODAT "highly offensive."11

VI. CONCLUSION

Based on the foregoing discussion, we will affirm the district court's ruling on the plaintiffs' constitutional claim. So long, at least, as the SODAT employees continue to employ the safeguards discussed in Part III, their direct observation method does not violate the Fourth Amendment.

In addition, we will affirm the district court's dismissal of the jury because the plaintiffs waived their jury trial right when they acquiesced on the record to the dismissal. Moreover, as we note in footnote 1, we will vacate the district court's holding that SODAT's drug testing procedure was permissible under the Collective Bargaining Agreement. Finally, we will vacate the dismissal of the state law invasion of privacy claim and remand this case to the district court for reconsideration of the state law issues.

_____

Plaintiffs resulting from the direct observation method was consented to by written contract." Wilcher, 924 F.Supp. at 619. We find the court's statement on this matter puzzling, as the court has cited no portion of the Collective Bargaining Agreement in which the firefighters actually consented to such a method of drug testing.

11. We know of no Delaware case that has discussed or been presented with this issue. We do not predict at this juncture what the Delaware Supreme Court would do if presented with this issue. Cf. Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765 (3d Cir. 1994) (if state court has not ruled on issue, federal district court must predict how it would decide issue). Moreover, the fact that direct observation method passes muster under the Fourth Amendment certainly may be raised by the City and SODAT in defense of the invasion of privacy claim. We simply hold that a federal district court cannot presume that a state's common law tort standard and a constitutional balancing test would reach the same result when applied to the same set of facts. The reasonableness of a procedure under the Fourth Amendment may be relevant to the inquiry under state law, but it is not necessarily dispositive of the state law claim.

23

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

24